United States District Court
Southern District of Texas

**ENTERED**

December 01, 2021

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| NORMA H. WINTERROTH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:20-CV-00218 |
| | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

## OPINION AND ORDER

Plaintiff Norma H. Winterroth filed this action pursuant to 42 U.S.C. § 405(g) to review the decision of the Commissioner of Social Security ("the Commissioner") to deny her application for Social Security disability benefits and supplemental security income. Now pending are Winterroth's and the Commissioner's cross-motions for summary judgment (D.E. 19, 20).[1] Winterroth contends that the Administrative Law Judge ("ALJ") erred when determining her residual functional capacity ("RFC") by failing to properly consider the opinion of treating physician Dr. Robert A. Fernandez. For the reasons discussed further below, Winterroth's motion (D.E. 19) is DENIED, the Commissioner's motion (D.E. 20) is GRANTED, and Winterroth's cause of action is DISMISSED.

## I.   JURISDICTION

---

[1] The Commissioner does not title the document as a motion for summary judgment. However, it is construed as such because it requests that the administrative decision be affirmed and the complaint be dismissed. (D.E. 20 at 9).

This Court has jurisdiction under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security and venue is appropriate because Winterroth resides in San Patricio County, Texas.  42 U.S.C. § 405(g); 28 U.S.C. § 124(b)(6).

## II.   BACKGROUND & ADMINISTRATIVE RECORD

### a.  Application and Hearing

In October 2018, Winterroth filed applications for disability insurance benefits and supplemental security income, alleging a disability commencing on March 15, 2018.  (D.E. 13-6 at 3-11).  Winterroth claimed that her hand/wrist/arm problem, carpal tunnel syndrome, and back problem limited her ability to work.  (*Id.* at 4).  The Commissioner denied Winterroth's application both initially and on reconsideration.  (D.E. 13-4 at 22, 44).

In the Disability Determination Explanation at the initial stage, state medical consultant Dr. Karen Lee concluded that Winterroth had the RFC to: (1) occasionally lift and/or carry 20 pounds; (2) frequently lift and/or carry 10 pounds; (3) stand and/or walk for 6 hours in an 8-hour workday; (4) sit for 6 hours in an 8-hour workday; (5) push or pull without additional restrictions; (6) frequently climb ramps and stairs, balance, stoop, and crouch; and (7) occasionally crawl and climb ladders, ropes, or scaffolds.  (D.E. 13-4 at 7-8).  Dr. Lee further concluded that Winterroth was limited in her ability to use her fingers for fine manipulation, but had no other manipulative limitations.  (*Id.* at 8).  In the Disability Determination Explanation at the reconsideration stage, state medical consultant Dr. Tina Ward reached the same conclusions, except that she concluded that Winterroth had no postural limitations.  (*Id.* at 29-30).

2

At the hearing before the ALJ on September 19, 2019, Winterroth testified to the following. Her hands were weak and she was unable to lift things. (D.E. 13-3 at 40). She had carpal tunnel syndrome in both of her hands and had surgery on both of them. (*Id.* at 41). She took nerve pain medication and Tylenol for her hands, but it did not really help. (*Id.* at 42-43). The surgeries also did not help and her hand pain was still at an eight out of ten. (*Id.* at 43). She had trouble gripping things with her hands. (*Id.* at 43-44). She could not type on a computer. (*Id.* at 44). The pain in her hands was getting worse, and some days it was worse than others. (*Id.* at 44-45). On bad days, she could not cook for herself, cut her own food, do dishes, or sweep or mop. (*Id.* at 45). On good days, she could do light things like wiping down the table or making her bed. (*Id.*). She had bad days roughly four days a week. (*Id.* at 46). Her daughters helped her with everything else. (*Id.* at 46-47). She could only lift around five pounds. (*Id.* at 47). She had some trouble putting on her clothes. (*Id.* at 48). She watched movies or read books for fun. (*Id.* at 49). She could not return to the jobs she had previously because of her hand problems. (*Id.* at 51).

A vocational expert identified Winterroth's past relevant work as fast food worker and janitor. (*Id.* at 61). The ALJ asked the vocational expert whether a hypothetical person with the same age, education, and work experience as Winterroth could perform her past relevant work if they also: (1) could only perform light work; (2) could only lift 20 pounds occasionally, but lift and carry up to 10 pounds frequently; (3) could stand/walk for 6 hours in an 8-hour workday; (4) could sit for 6 hours in an 8-hour workday; and (5) could frequently handle or finger. (*Id.* at 61). The vocational expert testified that this person would be able to be a fast food worker. (*Id.* at 62). However, if the person was limited to

3

only occasional handling and fingering, they would not be able to be a fast food worker. She would be able to be an ironer, hostess, or counter clerk, however.  If the hypothetical worker was also required to take an extra half hour to hour break every workday, or was required to miss four days a month or more, she would not be able to maintain employment. (*Id.*).

### b. Medical Records

On July 10, 2017, Winterroth visited the doctor, complaining of numbness, tingling, and pain in both of her hands at night.  (D.E. 13-9 at 41).  She was diagnosed with bilateral carpal tunnel syndrome and given a soft brace to wear on her left wrist.  (*Id.*).  On August 2, 2017, she returned for a follow-up appointment and reported that the brace helped, but that she was still waking up at night with symptoms.  (*Id.* at 35).  She was given a brace for her right hand as well and referred for further treatment.  (*Id.* at 36).  On September 15, 2017, she returned and asked for stronger pain medicine.  (*Id.* at 33).  On November 26, 2017, Winterroth returned to the doctor to discuss test results on her hands, which showed moderate to severe compression on both median nerves.  (*Id.* at 29).  The doctor advised that she continue wearing both braces, increased her dosage of pain medicine at night, and referred her for surgery.  (*Id.*).

On December 29, 2017, Winterroth met with Dr. Robert Fernandez and reported bilateral hand pain and numbness, worse on the left side, that radiated to her left shoulder. (*Id.* at 22).  She had worn braces without significant improvement.  She was told to schedule surgery.  (*Id.*).

On March 14, 2018, Dr. Fernandez completed a carpal tunnel release surgery on Winterroth's left hand. (D.E. 13-8 at 18). At a follow-up appointment on April 23, 2018, Dr. Fernandez noted that the wound was well-healed, but Winterroth's skin was very dry, she had mild stiffness in the hand, and she had moderate discomfort in some areas. (*Id.* at 15). He referred her for therapy. She also had some numbness in her index and middle fingers, but he stated this was still normal. (*Id.*). At a follow-up appointment on May 21, 2018, Winterroth noted that she had only gone to three therapy sessions, and that while she was still having some discomfort, her hand felt much better than it did before the operation. (*Id.* at 14). Dr. Fernandez prescribed more therapy and indicated that he would schedule her for surgery on her right hand. (*Id.*). At a final follow-up on July 5, 2018, Winterroth had still only gone to therapy a few times. (*Id.* at 13). She reported that her left hand still bothered her significantly, but it was better than before surgery. She said she could not lift anything heavy with her left hand. Dr. Fernandez noted that she had excellent range of motion in her left hand and wrist, although the left hand was very weak. (*Id.*).

On July 11, 2018, Dr. Fernandez completed a carpal tunnel release surgery on Winterroth's right hand. (D.E. 13-8 at 20). At a follow-up appointment on September 17, 2018, Winterroth indicated that her right hand still bothered her and she still had pain that radiated into her forearm. (*Id.* at 10). Dr. Fernandez noted that the wound was well-healed, she had excellent range of motion in her right hand, and she had moderate tenderness in one area. (*Id.*). At a follow-up on October 22, 2018, Winterroth indicated that she still had a significant amount of discomfort in her right hand and forearm. (*Id.* at 9). Her left hand also bothered her, but the right was worse. Dr. Fernandez noted that she had regained most

5

of her range of motion, although she was unable to carry anything heavy and was concerned she would not be able to work.  Dr. Fernandez did not think she would be able to work. (*Id.*).

Winterroth indicated the following in a function report on December 2, 2018.  (D.E. 13-7 at 22-29).  She could not lift anything heavy after her surgeries.  (*Id.* at 22).  She had trouble sleeping because her hands became numb and she had pain in her fingers.  (*Id.* at 23).  She had no problem with personal care, although her daughter helped with her hair at times.  (*Id.*).  She could make light meals daily.  (*Id.* at 24).  She did household chores like laundry and hanging clothes, but she needed help hanging clothes or lifting heavy items. (*Id.*).  She left the house to pick up her daughter from school.  (*Id.* at 25).  She went shopping in stores.  (*Id.*).  She read the newspaper or watched TV for fun.  (*Id.* at 26).  She talked to others on the phone and sometimes went to church or a friend's house.  (*Id.*). However, she could no longer do things like fishing or climbing.  (*Id.* at 27).  She had difficulty lifting, reaching, completing tasks, and using her hands.  (*Id.* at 27).  She still used hand braces.  (*Id.* at 28).  She took hydrocodone and tramadol for her pain.  (*Id.* at 29).

On December 3, 2018, Dr. Fernandez completed a physical assessment form.  (D.E. 13-8 at 29).  He indicated that her impairments would frequently interfere with her attention and concentration.  She could walk one city block without rest or significant pain.  She could sit for two hours and stand/walk for two hours in an eight-hour workday.  She would have to take unscheduled breaks several times per day.  She could occasionally lift less than ten pounds, but never any more than that.  She had limitations with handling and

fingering, and could only use her hands to grasp, turn, or twist objects, use her fingers for fine manipulation, and reach with her arms for less than 10% of a workday. (*Id.*). She would be absent from work more than four times a month. (*Id.* at 30).

On February 12, 2019, Winterroth met with Dr. Hector J. Ortiz for a disability consultative exam. (*Id.* at 3). Winterroth reported that she had a history of lower back pain that was now an eight out of ten daily. She still had bilateral hand pain due to carpal tunnel syndrome, which was only minimally improved by the surgeries. She could sit and stand for one hour, walk three blocks, lift ten pounds, climb ten steps, and was able to dress and bathe herself. (*Id.*). Dr. Ortiz observed that she ambulated with a normal gait. (*Id.* at 5). She had some tenderness in her spine and a decreased range of motion. (*Id.* at 6). She had a free range of motion and bilateral 4/5 strength in all muscle groups in her upper extremities. (*Id.*). Her hand grip was 4/5 bilaterally and her fine finger movements were normal, although she had trouble handling small objects like a button with her left hand. (*Id.* at 7). Her sensation on both hands was decreased to light touch and a pin. (*Id.*).

Winterroth indicated the following in a function report on December 2, 2018. (D.E. 13-7 at 48-55). Her hands hurt when she tried to do things like mopping, folding clothes, making her bed, or cleaning the table. (*Id.* at 48). She had trouble sleeping because her arms and hands hurt. (*Id.* at 49). She could not brush her hair or shave. (*Id.*). She could make meals, although she tried not to make meals that required her to cut or chop too much because it made her hands hurt. (*Id.* at 50). Her daughter swept the house, cleaned the dishes, and helped with laundry. (*Id.*). A friend mowed the lawn and did yard work. (*Id.* at 51). She did not drive, but went outside every day to take her daughter to school and

walk.  She went shopping in stores.  (*Id.*).  She liked to read the newspaper, watch TV, and play games with her daughter.  (*Id.* at 52)  She could not go outside and play ball or run anymore.  She talked to others on the phone and went to church, her daughter's school events, or to visit her other daughter.  (*Id.*).  She had difficulty lifting, bending, reaching, and using her hands.  (*Id.* at 53).  She had to rest if she walked for 15 to 20 minutes.  (*Id.*).  She used the hand braces for pain.  (*Id.* at 54).  She was taking hydrocodone for pain when her hands were particularly bad.  (*Id.* at 55).

On May 15, 2019, Winterroth visited the doctor and complained of hand pain at an eight out of ten that was made worse with exertion.  (D.E. 13-10 at 16).  She noted that she had surgery on both hands, but indicated that the pain never went away.  (*Id.*).  She had a weakened grip due to wrist pain.  (*Id.* at 18).  The doctor prescribed pain medicine.  (*Id.*).  She returned to the doctor on June 26, 2019, and indicated that the medicine had not helped.  (*Id.* at 19).  She was prescribed new medicine.  (*Id.* at 21).  She returned on August 12, 2019, and reported hand pain at a nine out of ten that was worse with movement.  (D.E. 13-11 at 3).  She was given refills on her prescriptions.  (*Id.* at 4).

### c. *ALJ Decision*

On October 30, 2019, the ALJ issued an opinion concluding that Winterroth was not under a disability since March 15, 2018.  (D.E. 13-3 at 11-21).  At the first step of the sequential evaluation process, the ALJ concluded that Winterroth had not engaged in substantial gainful activity from the alleged onset date of March 15, 2018.  (*Id.* at 13).  At the second step, the ALJ concluded that Winterroth's carpal tunnel syndrome limited her ability to perform basic work activities.  (*Id.* at 13).

At the third step, the ALJ concluded that Winterroth did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (*Id.* at 15). The ALJ concluded that Winterroth had the residual functional capacity ("RFC") to perform light work, with an additional limitation that she could only frequently handle or finger. (*Id.*). In reaching this conclusion, the ALJ found that Winterroth's medically determinable impairments could be expected to cause the symptoms that Winterroth alleged, but that her statements regarding the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical and other evidence in the record. (*Id.* at 16).

The ALJ summarized the medical evidence, noting specifically that: (1) Winterroth indicated that her left hand felt much better after surgery; (2) both hands had an excellent range of motion in both hands following surgery, although her hands remained weak; (3) the consultative physical examination showed that Winterroth maintained most of her hand strength; (4) there was some limitation with handling small objects; and (5) Winterroth continued to report hand pain and weakness. (*Id.* at 16-17). The ALJ found Dr. Ward's consultative examination more persuasive than Dr. Lee's to the extent that she did not include postural limitations, but noted that both Dr. Ward and Dr. Lee included a limitation of only frequent fingering. (*Id.* at 17-18). The ALJ did not find Dr. Fernandez's December 2018 physical assessment persuasive because it was not consistent with his own treatment records or the rest of the record. (*Id.* at 18). Ultimately, the ALJ concluded that Winterroth's hand pain, slightly decreased upper extremity strength, and decreased

sensation supported the RFC determination that limited her to light work with frequent fingering and handling.  (*Id.*).

At step four, the ALJ concluded that, based on her RFC, Winterroth was unable to perform any past relevant work.  (*Id.*).  However, at step five, the ALJ concluded that, based on her RFC, age, education, and work experience, Winterroth would be able to work jobs such as ironer, hostess, or counter clerk.  (*Id.* at 19-20).  Thus, the ALJ concluded that Winterroth was not under a disability since March 15, 2018.  (*Id.* at 20).

The Appeals Council denied Winterroth's request for review of the ALJ's decision. (*Id.* at 2-4).

## III.  DISCUSSION

In her motion for summary judgment, Winterroth contends that the RFC determination was insufficient and not supported by substantial evidence because the ALJ rejected Dr. Fernandez's opinion regarding her limitations.  (D.E. 19-1 at 11-12).  She argues that the ALJ did not adequately explain why she concluded that Dr. Fernandez's physical assessment was not well supported by the record and was unpersuasive.  (*Id.* at 13).  She argues that the ALJ improperly considered only the evidence that supported her conclusion and ignored contrary evidence.  (*Id.* at 13-15).  Finally, she argues that these errors mean that the ALJ's conclusion was not supported by substantial evidence.  (*Id.* at 15-16).

The Commissioner responds that the ALJ properly concluded that Dr. Fernandez's checkbox form was unpersuasive because it was a brief and conclusory statement that could be disregarded.  (D.E. 20 at 6).  The Commissioner argues that the ALJ properly discussed

and cited to the examination notes from Dr. Fernandez and others to conclude that the drastic limitations that Dr. Fernandez found in the December 2018 form were not supported by the other medical records, including his own examinations. (*Id.* at 7-8).

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The burden has been described as more than a scintilla, but lower than a preponderance. *Id.* The court must "scrutinize[] the record," but "may not reweigh the evidence or substitute its judgment for the Commissioner's." *Id.*

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether: (1) the claimant is participating in substantial gainful activity; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform other relevant work. *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof on the first four steps, with the burden shifting to the Commissioner at the fifth step. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

Before going from step three to step four, the ALJ assesses a claimant's RFC. *Perez*, 415 F.3d at 461. RFC "is a determination of the most the claimant can still do despite [her]

11

physical and mental limitations and is based on all relevant evidence in the claimant's record." *Id.* at 461-62.  When assessing a claimant's RFC, the ALJ must consider all relevant medical and other evidence, including statements by the claimant and their family members regarding the limitations that result from their symptoms.   20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

The ALJ has a duty to fully and fairly develop the facts.  *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).  However, the ALJ does not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  The ALJ considers several factors when evaluating medical opinions, including: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors as applicable.  *Id.* §§ 404.1520c(c), 416.920c(c).

The most important factors when evaluating persuasiveness are supportability and consistency.  *Id.* §§ 404.1520c(a), 416.920c(a).  "Supportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  *Id.* §§ 404.1520c(c)(1); 416.920c(c)(1).  "Consistency" means that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  *Id.* §§ 404.1520c(c)(1); 416.920c(c)(1).

The ALJ must articulate how persuasive they find all of the medical opinions and prior administrative medical findings in the record. *Id.* §§ 404.1520c(b), 416.920c(b). When a medical source provides multiple medical opinions, the ALJ may consider them in a single analysis. *Id.* §§ 404.1520c(b)(1), 416.920c(b)(1). The ALJ must address supportability and consistency, but the other factors are optional. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).

"A medical opinion is a statement from a medical source about what [the claimant] can still do despite [the claimant's] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in the claimant's ability to perform the physical or mental demands of work activities, perform other demands of work, and adapt to environmental conditions. *Id.* §§ 404.1513(a)(2), 416.913(a)(2). Medical signs and laboratory findings are "objective medical evidence." *Id.* §§ 404.1513(a)(1), 416.913(a)(1). "Other medical evidence" includes any other evidence from a medical source, including judgments about the nature and severity of the claimant's impairments. *Id.* §§ 404.1513(a)(3), 416.913(a)(3). An ALJ may discount medical opinions that use a checkbox format if the ALJ finds them to be unsupported by the evidence. *Foster v. Astrue*, 410 Fed. App'x 831, 833 (5th Cir. 2011). However, this does not mean they are not medical opinions subject to the consideration requirements in the regulations.

"Light work" involves: (1) lifting no more than 20 pounds, but lifting or carrying up to 10 pounds frequently; and (2) a good deal of walking or standing, or some pushing or pulling of arm and leg controls when it involves sitting most of the time. 20 C.F.R. §§ 404.1567(b), 416.967(b).

Here, the ALJ applied the proper legal standard when evaluating Dr. Fernandez's medical opinion, and substantial evidence supported her ultimate RFC determination. First, the ALJ explained why she concluded that Dr. Fernandez's opinions regarding Winterroth's limitations were unpersuasive.  The ALJ addressed the supportability factor, stating that Dr. Fernandez's "consistently normal examinations of the claimant, which noted primarily tenderness and weakness in both hands, do not support the extent of the limitations provided."  (D.E. 13-3 at 18).  The ALJ discussed each of Dr. Fernandez's examinations of Winterroth earlier in the decision.  (*Id.* at 16).  Further, the ALJ addressed the consistency factor, noting that "the exertional limitations he provided do not appear consistent with the claimant's consistently normal gait during both a consultative examination and visits with her primary care providers," and "the only other detailed examination of the claimant's hands and wrists noted nearly full strength and grip strength, with only slightly decreased fingering in the left hand." (*Id.*).  The ALJ need only address the supportability and consistency factors.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). Because the ALJ here did so, she applied the proper legal standards.

Second, substantial evidence supported the ALJ's ultimate RFC determination that Winterroth could perform light work with only frequent handling and fingering.  The consultative medical examiners at the initial and reconsideration stages both concluded that Winterroth could occasionally lift up to 20 pounds, frequently lift up to 10 pounds, push or pull without additional restrictions, walk and/or stand for up to 6 hours, and sit for up to 6 hours, all of which are consistent with the ALJ's RFC determination.  (D.E. 13-4 at 7-8, 29-30).  The consultative examiners also concluded that Winterroth was limited to frequent

14

handling and fingering, which the ALJ included in the RFC determination.  (*Id.*).  Further, Dr. Fernandez consistently found that Winterroth retained a good range of motion in both hands, and Dr. Ortiz concluded that she retained 4/5 strength in both of her upper extremities.  (D.E. 13-8 at 6-7, 9-10, 13).  While there is some evidence in the record to support Winterroth's claim that the RFC determination should have included greater restrictions, this Court is not allowed to reweigh the evidence, and the substantial evidence standard requires only more than a scintilla, but less than a preponderance, of evidence in support of the ALJ's conclusion.  *Perez*, 415 F.3d at 461.  That standard was met here.

## IV.  CONCLUSION

Based on the foregoing, Winterroth's motion for summary judgment (D.E. 19) is DENIED, the Commissioner's motion for summary judgment (D.E. 20) is GRANTED, and Winterroth's cause of action is DISMISSED.

ORDERED on December 1, 2021.

Julie K. Hampton
United States Magistrate Judge